Please proceed, Mr. Neal. Good morning again, Your Honors. And may it please the court, Brian Neal for BNSF. The district court erred in granting the EEOC's motion for summary judgment on liability against BNSF and in denying BNSF's motion for summary judgment. There were three independent grounds we laid out in our brief as to why the district court erred. I plan to focus on the third of those today, absent questions on the others. And that ground is that the ADA on its face permits the conduct for which the district court found BNSF liable. Specifically, the ADA expressly allows employers to require at the post-offer phase medical examinations of applicants and to condition those conditional offers on the results of those medical examinations. The district court erred in refusing to follow that principle in a number of ways. And I want to talk about some of these. And they're all laid out in the brief. The district court said at the outset that the process is such that when an employer makes a conditional offer, the offer is irrevocable unless for reasons that are job-related and consistent with business necessity. We know that that cannot be the case because the case law, including this court's decisions, including Judge Fisher's opinion for the court in the Leonel case, state that an employer can withhold or revoke an offer in the instance where an applicant has lied about a health condition. Or it's at least implied in the same case that if an applicant, once it gets to that third stage, refuses to disclose information about a medical condition. And those are situations that would not be within the EEOC's understanding of job-related and consistent with business necessity. So that in itself shows that the irrevocability principle that the district court adopted as the linchpin for its rationale is incorrect. A second overarching problem is that the court, throughout the reasoning, treated... Counsel? Yes. Could you, yeah, pull it closer? Yes, is that better? A second overarching issue is that the district court treated asking questions about and conduct regarding an applicant's medical condition as facial discrimination, in the same way as if an employer had asked questions or engaged in conduct concerning race or national origin or sex. But those things are fundamentally different. If an employer asks questions or imposes a requirement on an applicant because that applicant is female or because of that applicant's race, the employer says, you go get an MRI because of your race, or you go get an MRI or do something else because you're female, of course that's facial discrimination. And the district court erred by equating those two and not recognizing the fundamental differences between Title VII and other discrimination statutes and the ADA. And that difference is that the ADA, at the right phase, allows and in some instances even requires that an employer think about, study, consider, and act on an applicant or an employee's medical condition. The statute and the provision that I spoke about at the beginning that permits employers to require medical examinations allows employers to look at medical conditions, to think about them, to think about how they will affect the workplace. In a case, and this is not this case, but in a case that involves a reasonable accommodation issue, an employer is required to look at medical conditions. So it cannot be the case that doing those things has the same adverse... I thought, you know, what troubled the district court and I think what's the root of it is that he had to pay for the medical exam that was requested, the MRI. We thought that at the beginning, Your Honor, but the district court made it absolutely clear that was not her concern. We had a phone conference after her initial ruling and she very bluntly told both parties, you all are focusing on this cost issue. That was not the basis for my ruling. It's not about cost. The basis for my ruling was that BNSF ended the process when it didn't get the information. It's not about who has to pay. It's that I'm holding that BNSF has to continue the process. Well, do you think we would even have a lawsuit? You'd be here today if you had paid for the MRI? Well, I don't know because I don't know what the decision would have been made. Well, I mean, he wasn't able to get an MRI because he couldn't pay for it. Well, that's actually a disputed issue of fact. And so if your ruling ends up turning on that... Well, I don't know what my ruling is going to turn on. I'm just trying to understand your argument. That's all. Well, my argument is, and again, we thought it was about cost to begin with and the district court corrected us on it and said, no, it's not. And so I'm going on the rationale the district court told us that... Let me ask you, did BNS perceive him to have a disability? No. No, they didn't? No, we had it. And this is one of those other two grounds that we've laid out in the briefs. But no, we looked at someone who came in and said, look, I had a bulging disc four years ago. It's completely resolved. And he gave us an MRI from four years earlier, which showed not a bulging disc, but a disc extrusion. And the doctor explained that disc extrusion is not a permanent condition. It is capable of, and they do fully resolve. I wanted to know what the current status of it was. That's why I asked for an MRI. That is absolutely not perceiving someone as having impairment. He was qualified to do the job. He was, well, he was qualified in the sense of he got the conditional offer. You made him an offer. He, so... Sure. He met the, there's two stages of qualifications. He met the requirements to get an offer. Sure. But they never made a determination on the second stage, which is whether he had the physical capabilities. They made him a conditional offer. Conditional offer, right? That's right. That's right. And that's what kicked it into that process that allows the... So how is he, what did he have to do to satisfy the condition? He had to comply with the requirements to obtain the medical exam that BNSF directed. And in this instance, and the parties agree that includes, that's not just one exam. That includes any medically related follow-up inquiries or follow-up medical testing that the employer requires. So in this instance, that's what it involved, was the follow-up request. Once he provided the initial information about his back, he had to go and get the MRI and provide some records related to his back. It's one thing to require him to get records related to his back. There's quite another thing to say. You have to take it. You have to go out and get an MRI and pay. It's not... Those are not inexpensive. Well, again, there was disputed testimony on the cost and there was... I don't mean to get into the cost, but I'm just... I want to make sure I understand what he had to do. Yeah, he had to go get an MRI. And frankly, he was not being forthright with his own doctor. And if he had been, his insurance probably would have paid for it because the same day he went in to see his doctor to get a letter to send to BNSF, he went to see his chiropractor, as he had been doing on a routine basis, for the very reason of back pain. But he wasn't telling his primary doctor about the back pain. He was telling his doctor he didn't have any back pain, which is why his doctor sent BNSF a letter saying he didn't have back pain. So there are all sorts of issues surrounding why he didn't get the MRI that go far beyond the EEOC's repeated assertions that he just couldn't do it. So I have a question. It's maybe difficult to focus just on his individual case alone in thinking about this for me. So I'm asking myself, what are the implications of having a rule where an important employer, like your client, can put the burden on the individual to get expensive tests? Because it could be, if that's true, that that would disqualify a lot of applicants based on financial inability to pay, regardless of whether he really could have paid. The question is, the rule that's to be adopted, what impact would it have? The rule would be that an applicant, when they get to the post-offer stage, and the employer is able to require a medical exam, that it would be, unless the employer takes that on itself, require includes the requirement that the applicant pay for the test, if that's what the employer says. If I'm required to keep my law license, and that requires me to pay annual dues, unless I have an arrangement with my employer, that requirement that I maintain my license takes with it the requirement that I pay for that law license every year. Now, the concern that I think some have is that an employer might intentionally use that ability as a way to knock out people who report medical conditions that they're concerned about, and they don't want to dig in and really find out. That's a theory that could be pursued just on a straight pretext disparate treatment claim, that the basis for asking for the information was discriminatory. That's not the theory that EEOC pursued here. That's not the theory that Judge Peckman found that BNSF had, on which she found BNSF liable. She found automatic liability. And so, in that situation, that person, if that were the situation, would still have recourse. I think she found BNSF liable because she concluded that this requirement of having to get this medical test was discriminatory. She characterized it. When you talked a minute ago, I couldn't, I had forgotten at the moment you made the statement that when we were talking about cost, the initial theory I thought of the EEOC was there was a disparate impact case. And she said, initially, she thought that's what the case was about. Right. And then she said, no, no, no, no, no, we're not going to treat this as a disparate impact case. I made a mistake. She said, we're going to do this as a disparate treatment case, discrimination case. That's right. But then she put the word discrimination in quotes because she, and she referred to facial discrimination, which is what she characterized the action based on withdrawing the offer before the end of the process, which is what she told us had been the basis of her ruling. And that's that first principle that I was talking about. That gets to whether the discriminatory treatment, the treatment aspect, the adverse impact issue, the adverse action. Well, that was what she characterized as the disparate treatment as well, as the discrimination. She didn't say you wouldn't. Withdrawing the offer. Right. Well, withdrawing it before the end of the process was automatic discrimination under the statute. Automatic disparate treatment discrimination was what she said. And the basis was because she invoked this principle that said you cannot withdraw the offer before the process is completed. And that's the principle that at the beginning I was saying is as a matter of law wrong and frankly is actually drawn from disparate impact cases. And the judge just mistakenly failed to recognize that. If there are no other questions at this time, I'd like to reserve the remainder of my time. That's fine. Please do. Thank you. Okay. Ms. Oxford. Good morning and may it please the court. My name is Susan Oxford. I represent the EEOC as appellee. Russell Holt sought a job from BNSF so he could support his family when they relocated to Seattle. He didn't get that job because BNSF demanded an expensive medical test that Holt could not afford. EEOC brought this lawsuit because BNSF's actions violate the ADA and the district court's decision should be affirmed. I'd like to start by addressing something from the earlier argument. My colleague, Mr. Ramshaw, was asked how much deference the Ninth Circuit owed the EEOC and he said we were not asking for deference with respect to the regulations on obesity but not that it's not warranted. And as we point out on page 26, footnote 6 of our brief, Chevron and our deference is EEOC's guidance and the positions taken in litigation because Congress has expressly authorized us to promulgate regulations and our guidance explaining those regulations are warrant deference by this court. The case, Mr. Neal was talking about the case is not about cost and you have to look at the district court's statements on this issue holistically. The crux of this case is that an employer cannot stop the process for hiring an applicant midstream because it asked for an additional test that the individual cannot afford. And we want to make it clear that the EEOC's position throughout is employers can ask for more information. But if you look at the EEOC's guidance, in every opportunity we've had to speak on this topic, we have made it clear that the employer is responsible for paying for any examinations that it requires. You see that in our technical assistance manual, you see that in our pre-employment medical examination guidance and in our guidance respecting what employers can do with respect to employees after the fact. Now, BNSF wants to argue that the facts are in dispute here, but none of the facts that BNSF points to are either in dispute or material to this case. Mr. Holt may have been confused about who he spoke to when he called his doctor's office about the MRI, but he was accurate about the response, and that is that the doctor's office would not authorize an MRI when he was not in pain, and Dr. Heck confirmed that in his deposition. BNSF argues that he could have gotten the MRI if he had been honest about being in pain, but he wasn't, not the kind of pain that warrants an MRI, which Dr. Gerard said is significant pain. He was seeing his chiropractor for maintenance, and his deposition at Excerpts of Record 382 make it clear that it was maintenance visits that prompted his ongoing chiropractor visits, and the chiropractor described the treatment as conservative treatment involving chiropractic adjustment and massage. And most of the records in the latter part of 2010 and 2011 from the chiropractor indicate that he was describing improvement in his condition or the same, i.e., he was still improved. So BNSF is incorrect that Mr. Holt was not acknowledging pain that he was experiencing that would have warranted an MRI. So what do you understand the district court's holding to be? The district court held that an employer must complete the application process once it begins. The individual has to be cooperative with that process, as Mr. Holt was here. If the employer wants more information, it can have it, but it has to pay for it. If it chooses not to pay for additional information, it must make a decision based on what it has. So she concluded that that was a violation of the ADA because it resulted in discrimination against a person with a disability. The discrimination here, yes. The generic non-discrimination provision in 12112A says employers can't discriminate on the basis of disability in hiring. And Mr. Holt was not hired because of his disability here. BNSF says that it had no results to evaluate, that it didn't fail to hire him because of his disability, but because it didn't have results. Now, the statute does seem to contemplate that employers, it may be appropriate for employers to require medical information. Absolutely. Correct? Yes. And BNSF says, well, that's all we were doing. It's just getting, we needed necessary medical information to evaluate for him to satisfy the condition that we identified. That is correct. And what the ADA requires is that an employer can set up any type of post-offer pre-employment exam it wants as long as everybody gets the same initial exam. And that happened here. Mr. Holt showed up for the BNSF exam. At the initial medical questionnaire, he self-disclosed his prior back condition. And BNSF's provider of their choice, CHS, asked him to obtain medical records, which Mr. Holt did. And he submitted those at the end of September. A week later, he participated cooperatively with the physical exam that BNSF established. And that is the employer's prerogative to set up the exam. The contract doctor for BNSF, Dr. Hickson, administered the standard police officer medical exam. She administered a separate medical exam to look at his back because he had disclosed a back injury. And he underwent the standard isokinetic exam that every applicant for a police officer must undergo. He passed that with a 95 percentile, something that's designed to assess the strength. He passed the lumbar exam that Dr. Hickson administered. And she said she found no abnormalities and no reason for limitations. She completed a four-page summary on BNSF's own medical examination report, which you can find at excerpts of record 1397 to 1400, a four-page report in which she said on page two she found no abnormalities. On page three, that in her opinion, the candidate is not likely to develop any physical symptoms or limitations that could impair his performance within the next two years. And on page four, that in her opinion, the candidate was not likely to pose a risk to the health and safety of self or others within the next two years. And finally, no limitations or restrictions needed. Now, that, the BNSF had Dr. Hickson's report, its own contract doctor. BNSF also had the report from Holt's own treating physician who examined him when he went in in September to get a statement and found no current pain or limitations or abnormalities in his back. BNSF had the report from Holt's chiropractor saying that he had been seeing him for conservative treatment and had found no need for any light duty or limitations for the prior two years because of his back. And BNSF had Holt's own statement that in the four years since his back injury, he had been performing a job of comparable rigorousness without any need for taking leave or light duty because of his back. Counsel, who first suggested, let's get an MRI? That would be Dr. Girard. So with all of these five sources of information showing that Holt could do the job, CHS, the who makes these decisions generally for BNSF, and he determined that more information was needed. He requested an MRI, and Mr. Holt tried mightily to obtain that. But as the record indicates, he was unable to get his doctor to approve it. He did some research on what it would cost out of pocket and came up with a cost of between $2,000 and $2,500. And he asked, begged that the condition be removed, and the answer was no. So EEOC would agree if they wanted an MRI test, they could require that, but at their own expense?  And the district court- And where do we find what part of the statute, what statutory language do you contend supports the idea that not doing that at their own expense violates the statute or an interpretive reg? So we would say the statute does not address cost per se, and you reach the result that the district court reached by looking first at the generic nondiscrimination provision in subsection A, and then subsection D says the medical examinations is another aspect of discrimination if an employer does not do medical exams consistent with the scheme set out here by Congress. And subsection D3 says that an employer can give the medical examination after it makes the conditional offer, but it must use the results in accordance with the subchapter. And so that is it can give an exam and individuals must comply, but if it doesn't hire the individual, then it would need to be able to point to something in the ADA that gives it that opportunity to reject the individual. For instance, if the medical exam shows that the individual cannot do the job, which as I pointed out, the examination here shows exactly the opposite, if the medical exam shows that the individual would be a danger to themselves or others, that would be another reason that the ADA allows an employer to reject an applicant. And I think Judge Paez, you might have asked earlier what would have happened here if Mr. Holt was able to obtain the MRI or BNSF had paid for the MRI, if they still didn't hire him, then the question would be, is that non-hire authorized under the ADA? That would be exactly the situation we'd be in. But of course, effectively, they didn't hire him on the grounds that they needed more information, and that is not one of the provisions that the ADA permits an employer to walk away from an otherwise qualified individual. So is the discrimination not offering him a job on the basis of all the information they had when he couldn't afford to get his own MRI? That's correct. And the question is not how much did the MRI cost, and if it was less, could he maybe have afforded it? It's that the statute is constructed that it's the employer that requires the medical examinations. Now, if a particular employer set up a post-offer pre-employment medical exam requiring every applicant who was offered a job must go get their own doctor to certify their medical qualification. Across the board, everyone, and that entailed some cost to the applicants, the prospective employees. Isn't that what some employers do with respect to drug tests? I'm not sure if that's true or not, but if it was, it would be consistent with the ADA because it would be across the board required of everyone. But many employers, as did BNSF, would rather have their own doctor examine the individual because they want to be able to trust the outcome. And so Dr. Hickson, BNSF's doctor, examined Holt and decided that he met the physical qualifications. Once that's done, any further tests are the responsibility of the employer. And that's clear from the EEOC's technical assistance manual, from the guidance on pre-employment medical inquiries, and from the, by implication, the guidance that we've provided employers on employee medical exams, although not completely, doesn't require, doesn't apply to the same situation. It still indicates that the employer has to pay. So there's one last issue that they raised, which was the district court granted an injunction. Yes. And they challenged that. They said there was no need for an injunction here. This is just a one-off situation. Well, of course, it's not a one-off situation, as they admit. And that was the primary basis for the district court's grant of an injunction, is that BNSF, in its briefing below, had said that this is its standard procedure nationwide and that, and so the injunction is a moderate response, a measured response to make sure that BNSF complies with the law. I have a question about the injunction. Yes. The court relied on one of our old Ninth Circuit cases that said something like, if somebody acts wrongly and it's not shown they're going to correct it, it's appropriate to do an injunction. But how can you do a nationwide injunction without going through the analysis of the four factors that are set out in the Winter case or in the Gertz and Seed case and reviewing all those which are, incidentally, the same factors that some of us were taught in law school? We agree that a court considers, bases an injunction on equitable considerations. Under Title VII, this court and other circuits have long looked to see whether the injunction is needed to remedy the discrimination and is it as broad, but only as broad, as needed to accomplish that purpose. So we think that the standards that courts have long applied remain the proper and the equitable considerations, but to the extent this court disagrees and believes that the four-part considerations found in the Supreme Court's Ebay and Monsanto decisions apply, they are readily satisfied here. If you look at the first two factors, existence of irreparable injury and adequacy of legal remedies. Clearly, when individuals do not get a job, even if they realize they were subject to years later, get some monetary relief, it doesn't fully remedy the cost to those individuals from losing out on the job that they should have had at the outset. And furthermore, the EEOC is the plaintiff here. Our mission that Congress gave us to enforce the law is seriously undermined if we are not able to eliminate the discriminatory practice from the workplace and only ten years later try to get money relief for those individuals we happen to learn about. I can understand that, but I guess what I'm asking is, did the district court in Judge Beckman's rationale discuss not only irreparable injury, but also the public interest and the balance of hardships? I think it's implicit in the court's decision. Did she explicitly go through those factors? No, she did not. I think Winter said it had to be done in the Gertz and Seed case. Also at Monsanto, I thought that said that. She did not go through the factors one by one. I think it's very apparent from the record. They're readily satisfied. Does it make a difference that this was a permanent injunction as opposed to a preliminary injunction? I'm not sure whether that should make a difference, but I think the factors, certainly in a preliminary injunction, there is more of a burden on the plaintiff to demonstrate why an alteration should happen before a final judgment. And here, there's been a determination of liability in the EEOC's amended complaint. The primary reason we brought this was to eliminate discrimination from BNSF's workplace and only secondarily to get relief for Mr. Holt. So we think the injunction— We've taken over your time with our questions, but they're important questions. So thank you. Thank you. Thank you for your answers. Now we'll hear from Mr. Neal. And Stacy, why don't you add two minutes to Mr. Neal's rebuttal time in case he wants it. You don't have to use it up, but I think a couple of us are interested in the injunction issues. Okay. Well, I will get to that. I wanted to try to hit three quick points and then get to the injunction, if I may. On the—as I understand the EEOC's rationale about the cost, it's saying that because the issue here was a follow-up exam after the initial exams, which we all agree is required to be borne by the employer, if that is true, then why wouldn't just asking for the information at that stage also be discrimination? It's also based on the medical condition, and that's—the medical condition is the reason we're asking for it. So what about cost makes that different? The legal theory would seem to be the same. The district court counsel seemed to think in their summary judgment order that you had ordered the exam and you had the option of paying for an expensive exam if you wanted to defend your decision not to hire. You impose the requirement, so by imposing the requirement and his not being able to furnish the MRI, as counsel for the EEOC said, you're basically removing the confirmation from the record of the bona fides of BNSF's decision to withdraw the offer. It's your burden to show that the MRI has a legitimate purpose, and if you preclude it by not paying for it, I mean, he may have been able to get it through insurance, but you needed it to justify your decision not to hire. That's what I understand the theory being, and Judge Beckman does talk about the cost in her summary judgment order. And I'll say two things about that. Statute expressly allows the employer to require the exam. Requiring the exam doesn't say you can require it only if you pay for it. It allows us to require the exam, and that carries with it the ability to impose those costs if that's what is needed. That's the part of it. It's a fundamental feature of the statute. Employers were not relinquished of that right when the act was passed. That right was postponed to that final stage. That doesn't answer my question, which is you ordered it. It doesn't say you can do it at the employee's expense. It doesn't say you can't, but the argument is you required it. It's okay for you to require it, but then you can't justify your non-hire decision on failure to get what you required. The justification is the failure of the condition. We're allowed to condition the offer on the results of the medical examination. When Mr. Holt did not provide the medical examination or comply with the requirement, that condition failed. That's the reason that the process can be terminated, because it was never completed. Now, the EEOC says, oh, well, you had enough. You had enough. That's results. No, we didn't have results. We had information. And I'll note the statute distinguishes between information and results. When you look at it, results are the completed final process. Information is what you get along the way, and the statute uses both terms. We did not have results, because the information, the final exam was not provided, because Mr. Holt did not provide it. And finally, the other point that I wanted to make is EEOC talks about this case as though they're defending a jury verdict in their favor. This was a summary judgment granted against BNSF. All of those facts that you heard about the need for the MRI, about being approved by the other doctor, and a number of other issues are things that were hotly disputed. And Judge Peckman didn't get to those, because she used a different theory than what you're hearing today. If you rely on those issues, like he couldn't get the MRI, he couldn't afford the MRI, these other doctors had already approved him, those were all wrapped up in factual issues because those other approvals were based on incomplete, and in some cases, false information that Mr. Holt had provided. And so we can't come in and say, we're going to grant summary judgment against you on a matter that you do not have the burden of proof on because Mr. Holt just says, I couldn't provide the information, or because EEOC just says, you had enough information. That's enough. We're calling it. That's the results. The results are in when the employer says they are in, because it's the employer who has the right to get the information. Let's talk about the injunction for just a few minutes, for a minute. Yeah, the injunction. You're over your added time that Judge Gould gave you. You're over your extended time. I'm being a bad presiding judge. I'm sorry about that. Both counsel are going over time, but it is an important case. So please address the— The injunction point is, or basic legal point is, the Supreme Court has made clear in recent cases that were not Title VII or ADA cases, but other cases that a permanent injunction can be issued only if the traditional four equitable factors are complied with. And the district judge made no effort to satisfy those requirements. She found they were likely to prevail if they ruled for them on the merits. Well, the likely to prevail would be what you would look at for a preliminary injunction. So what are the four factors for a permanent injunction? Well, you have to have the—I don't know that I can even recite them from memory. Irreparable harm. That the balance of hardships tipped to the parties seeking the injunction. Right. But I think— That the public interest favors the injunction. Okay. But I think our point was, you can't just say, I'm going to impose an injunction under the old case law and not look at the new case law. We're talking about a— I understand. You know, a procedural problem. The judge rejected that legal argument. And there was never any attempt to show that those factors were satisfied. And so we never got into a discussion about whether those four factors would have been satisfied. The EEOC said they didn't have to be, and the judge said they didn't have to be. Okay. Okay. Well, thank you, Mr. Neal. Thank you. I'm going to thank both— Great, Jim. No, wait, wait, wait, wait. Judge, Judge Fischer might have a question. He might have a question for me. Your wife says thank you. Oh, okay. Thank you, Judge Fischer. Okay, well, let me just reiterate. We really appreciate the views of experienced and learned counsel on these very hard issues. And we also appreciate that Mr. Neal traveled from Dallas, and Ms. Oxford traveled from Washington, D.C. And Seattle's a great place, but it's never easy to travel so far, so thank you. The Court will submit the EEOC case, and the Court will take a brief recess for 10 minutes.
judges: Fisher, Gould, Paez